UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

United States of America,

Plaintiff,

v.

Oluwadamilola Bamigboye,

Defendant.

Court File No. 25-cr-477 (LMP/JFD)

**DEFENDANT'S
MOTION TO SUPPRESS**

Pursuant to the Fourth, Fifth and Sixth Amendments, Defendant hereby moves for the suppression of all statements of the Defendant, including statements made to law enforcement on December 10, 2025, as well as all evidence adduced during and after Defendant's seizure on December 10, 2025, by the HSI agents in this case.

## FACTUAL BACKGROUND

On the afternoon of December 10, 2025, Mr. Bamigboye and his girlfriend (and co-defendant) Ms. Frazier pulled into the parking lot of Mr. Bamigboye's apartment building in a Jeep SUV driven by Ms. Frazier. Moments after Ms. Frazier parked the Jeep, two HSI agents in plain clothes approached her and Mr. Bamigboye. The agents claim that they were "conducting surveillance" of Mr. Bamigboye's car, which was parked in the lot, and that he was an "ERO target" for removal from the United States due to a lapse in his immigration status. Agents did not have an administrative warrant for Mr. Bamigboye's arrest or detention. Nor was Mr. Bamigboye suspected of committing a crime.

Mr. Bamigboye came to the United States lawfully on a student visa in 2019. He studied accounting at McNeese State University in Lake Charles, Louisiana, graduating with a B.S. in accounting in 2023. Before Mr. Bamigboye's student visa expired, he started the process of changing his status to a "skilled labor" visa under the EB-3 program. He received a labor certification through the Department of Labor, had an approved I-140 form signed by an employer (the McDonald's Corporation), officially sponsoring him for an employment-based green card. Mr. Bamigboye was still waiting for the government to grant his EB-3 visa application when the agents accosted him in his apartment parking lot.

According to agents, Mr. Bamigboye had overstayed his student visa while he waited for his EB-3 to be approved. The agents confronted him because they "were attempting to apprehend[] him for an administrative arrest for immigration violations." Surveillance video shows that agents in plain clothes approached Mr. Bamigboye in the parking lot without displaying any credentials, and when they began talking to him he got into the back seat of Ms. Frazier's vehicle.

An agent "grabbed at [his] arms and attempted to physically dislodge and remove him from the car." This encounter lasted mere seconds, then Ms. Frazier got into the car, as did the other agent, who jumped into the front seat as Ms. Frazier slowly drove off. Mr. Bamigboye, terrified, called 911 and provided information about their location, direction of travel, and destination as Ms. Frazier drove them to the New Hope police station to get help. The agent in the car later told investigators that he believed Mr. Bamigboye and Ms. Frazier wanted to get him to the police department to have him arrested. When Ms. Frazier stopped the car on the street in front of the police station, Mr. Bamigboye ran into a nearby

2

Hy-Vee, begging the employees to help him. A New Hope police officer arrived in the Hy-Vee within moments, and Mr. Bamigboye surrendered to the police officer.

FBI agents Terry Getsch and Kevin Brown interviewed Mr. Bamigboye shortly after his arrest. Agent Getsch engaged in the following *Miranda* colloquy with Mr. Bamigboye:

Getsch:         You have the right to talk to a lawyer for advice before we ask you any questions. You have a right to have a lawyer with you during questioning. If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish. And if you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.

Bamigboye:    If I decide to request a lawyer, are they right here?

Getsch:         They are not here right now. They would be appointed later by – you'd have an application if you don't have a lawyer, during a court process at a future point you could apply for one through the courts if you would like to have one. Or we can request one be appointed, essentially. But you would have to go through the process. Public defenders do not get appointed unless you're requesting them. Does that make sense to you?

Bamigboye:    I mean, kind of. But what I'm trying to understand-

Getsch:         And you have the right, it's entirely up to you – you can not say anything; you can not say anything unless you want an attorney; or you can talk to us and at any point you want an attorney present you can tell us you want an attorney present at that point.

Bamigboye:    So that's what I'm saying – if I want an attorney right now-

Getsch:         We wouldn't have one. We would just stop with any further going through this what's going on and we would just leave it at that and at some point down the road if you'd like to talk to us once you have an attorney we would talk to you then.

3

Bamigboye:   So if I decide to request an attorney where do we go from here if we can't get one now?

Getsch:   So where would we go from here? That's what I'm saying. It would be up to you if you want to request an attorney through the courts at a later point we could go through a prosecutor's office and request one be appointed to you if you're requesting one – but right now we're after hours you're not going to get an attorney here right now. So I'll leave it up to you, like I said, if you don't want to talk to us at all. The other thing is you can waive your rights and we can explain to you what's going on and there's certain parts you'd like to talk to us about without an attorney you can do that if you'd like to have that attorney just let me know and we'll stop and we don't need to go any further and we will get you an attorney at some point in the future if you need it.

Bamigboye:   So if I do sign it now, I still can request one-

Getsch:   At any point. At any point. So if you don't mind just so I can make sure you understand the form, can you just read that sentence and that just shows me that you understand what you're reading.

Bamigboye:   [Reading from form]: "I have read the statement of my rights and I understand what my rights are. At this time I am willing to answer questions without a lawyer present."

Getsch:   And like I said, at any point you want that lawyer just tell me and we'll get a lawyer but it's up to you how you want to proceed.

Bamigboye then signed the rights form and began answering questions from Agent Getsch.

## ARGUMENT

**I.     THE WARRANTLESS SEIZURE OF MR. BAMIGBOYE VIOLATED THE FOURTH AMENDMENT.**

As discussed above, the agents involved in this case initially approached Mr. Bamigboye to conduct an investigatory stop to ask questions regarding purported civil immigration violations. They could have used less-intrusive, traumatic, and abusive methods to effect this investigation than cornering Mr. Bamigboye in Ms. Frazier's car and forcibly grabbing him. He was in the back seat of a car, with no keys, and was not an escape risk. He had no criminal history, had entered this country legally, successfully completed his college degree pursuant to his student visa, obtained employer sponsorship, submitted the requisite paperwork, and was simply waiting for the government to act on his application for an EB-3 visa. At the moment the agent grabbed Mr. Bamigboye, it had not even been confirmed that Mr. Bamigboye was the person for whom they were looking. Nor had they asked him any questions about his identity or immigration status. Notably, the agents did not obtain an administrative warrant purportedly justifying their arrest and detention of Mr. Bamigboye until *two days* after they accosted him and set in motion the events of this case.

As a threshold matter, "if the police stop someone based on nothing more than possible removability, the usual predicate for an arrest is absent. When an alien is suspected of being removable, a federal official issues an administrative document called a 'Notice to Appear.' The form does not authorize an arrest. Instead, it gives the alien information about the [removal] proceedings, including the time and date of the removal hearing."

*Arizona v. United States*, 567 U.S. 387, 407 (2012) (internal citation omitted). Mr. Bamigboye did not receive a Notice to Appear regarding his purported status issues until December 20, 2025, ten days after agents seized him.

"Under *Terry*, the legality of police investigatory stops is tested in two parts. Courts first inquire whether the officer's action was justified at its inception and then examine whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop." *United States v. Quintanilla-Chavez*, 807 F. Supp. 3d 641, 660 (W.D. Tex.), *reconsideration denied*, 811 F. Supp. 3d 839 (W.D. Tex. 2025) (internal citations omitted).

Here, the agents did not have legal justification to seize Mr. Bamigboye. They lacked even an administrative warrant, let alone possessed a Notice to Appear to serve upon him. Even with those two documents, per *Arizona v. United States*, they had no authority to arrest him and by seizing Mr. Bamigboye the agents violated the Fourth Amendment. *E.g., Arizona v. United States,* 567 U.S. at 413 ("Detaining individuals solely to verify their immigration status would raise constitutional concerns.").

To the extent that the government contends Mr. Bamigboye's arrest was authorized by federal law or regulations purporting to authorize warrantless arrests of individuals based on suspicion regarding their immigration status – for example, 8 U.S.C. § 1357(a)(2) – such application of those laws here would violate the Fourth Amendment because Mr. Bamigboye had not committed any crime, he was not in the country "illegally," and no probable cause existed to suggest he was guilty of a criminal offense. *See, e.g., Brinegar v. United States,* 338 U.S. 160, 175 (1949) ("The substance of all the definitions of probable

cause [under the Fourth Amendment] is a reasonable ground for belief of guilt.") (internal quotation omitted); *Carroll v. United States*, 267 U.S. 132, 157 (1925) (defining "probable cause" under the Fourth Amendment as when "'the facts and circumstances before the officer are such as to warrant a man of prudence and caution in believing that the offense has been committed'") (quoting *Stacey v. Emery*, 97 U. S. 642, 645 (1878)).

Finally, even if the agents had the authority to seize Mr. Bamigboye pursuant to an initial investigatory stop based on civil immigration status issues, their expansion of that seizure was unreasonable and violated the Fourth Amendment. "An investigatory seizure can be expanded in two ways requiring commensurate reasonable suspicion. One is an expansion of duration. The other . . . is an expansion of intensity beyond the level of force justified by the officers' suspicions." *Quintanilla-Chavez*, 807 F. Supp. 3d at 662 (citing *Rodriguez v. United States*, 575 U.S. 348, 357 (2015); *Florida v. Royer*, 460 U.S. 491, 501–02 (1983); and *United States v. Zavala*, 541 F.3d 562, 579–80 (5th Cir. 2008)).

Here, by assaulting Mr. Bamigboye when he refused to answer questions and got back in the car, and by extending both the duration and the intensity of a seizure that originated solely as an investigatory stop to discuss potential civil immigration issues, the agents violated the Fourth Amendment.

Because the initial seizure of Mr. Bamigboye, and its continuation, violated the Fourth Amendment, the evidence adduced pursuant to this seizure, including Mr. Bamigboye's statement to Agent Getsch, as well as the statements of the HSI agents involved, and other fruits of the investigation, should be suppressed.

7

II.    **AGENT GETSCH VIOLATED THE FIFTH AND SIXTH AMENDMENTS BY PROVIDING MR. BAMIGBOYE A CONFUSING AND INACCURATE *MIRANDA* WARNING.**

The Fifth Amendment provides that "[n]o person… shall be compelled in any criminal case to be a witness against himself…" U.S. Const. amend. V. The State "may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

After the reading of the *Miranda* warnings, a suspect's waiver of the Fifth Amendment privilege against self-incrimination is only valid if it is made voluntarily, knowingly, and intelligently. *United States v. Syslo,* 303 F .3d 860, 866 (8th Cir. 2002). A waiver is knowing if it is "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine,* 475 U.S. 412, 421 (1986). A waiver is voluntary if it is "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id.* "The government has the burden of proving by a preponderance of the evidence that, under the particular facts and circumstances of the case, the waiver was an intentional, voluntary, knowing, and intelligent relinquishment or abandonment of a known right or privilege." *United States v. Black Bear,* 422 F.3d 658, 663 (8th Cir. 2005).

In *U.S. v. Jones*, the court concluded that the government had not met its burden to show waiver by a preponderance of the evidence because the questioning officer had confused the defendant regarding the availability of counsel. In *Jones*, after being advised of his right to the presence of a lawyer during any questioning, the defendant asked, "Can

8

I get a lawyer like right now, or do I have to wait?"  The interrogating officer responded: "You have to wait."  *United States v. Jones*, No. CR 06-244 (DSD/FLN), 2006 WL 3617876, at *6 (D. Minn. Dec. 8, 2006).

The court suppressed the defendant's statement, explaining:

> The Supreme Court made clear in *Miranda* that a criminal suspect has a right to a lawyer whenever he is subjected to custodial interrogation. If the police are unable to honor a suspect's assertion of that right, the only option is to terminate the interview. Here, Sergeant Jacobsen didn't do that. He instead attempted to use to his advantage the police department's inability to provide Defendant with counsel. He told the Defendant that if he wanted to consult with a lawyer, he would have to wait, suggesting that he did not have a right to consult a lawyer during the custodial interrogation but only at some later, unidentified time. Under this circumstance, Defendant's decision to talk to the Sergeant without a lawyer was clearly *not* a knowing and voluntary waiver of his Fifth Amendment right.

*Id.*; *see also United States v. Lewis*, No. 11-20745-CR, 2012 WL 6569373, at *9 (S.D. Fla. Dec. 17, 2012) ("The most [that explaining the right to appointment of a lawyer in court] does is inform [the defendant] that he will be appointed a lawyer at arraignment or some other future court date. While this is not inaccurate, it is not an explanation of the right to counsel sufficient to allow the Court to infer that [the defendant] understood the right to appointment of counsel during questioning.")

Here, as in *Jones*, Mr. Bamigboye asked if he could get a lawyer right at that moment, as was his constitutional right, and Agent Getsch told Mr. Bamigboye, "you're not going to get an attorney here right now" and instead led Mr. Bamigboye to believe he could only obtain legal representation after some "court process" at some future unknown

date: "It would be up to you if you want to request an attorney through the courts at a later point we could go through a prosecutor's office and request one be appointed to you if you're requesting one – but right now we're after hours you're not going to get an attorney here right now."

Because Agent Getsch's *Miranda* warning to Mr. Bamigboye was equivocal, confusing, and insufficient to support a finding that Mr. Bamigboye's waiver of his Fifth and Sixth Amendment rights was knowing, intelligent and voluntary. For this reason, his statement should be suppressed.

## <u>CONCLUSION</u>

For the above-stated reasons, the Court should suppress Mr. Bamigboye's statement and the other evidence adduced subsequent to his seizure by the agents.

Respectfully submitted,

DATED: May 15, 2026

*/s/ Kevin C. Riach*
Kevin C. Riach, #389277
125 Main St. SE, Suite 339
Minneapolis, MN 55412
Telephone: 612.203.8555
kevin@riachdefense.com

**ATTORNEY FOR DEFENDANT**